UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| FIRST TECHNOLOGY CAPITAL, INC., | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | No. 5:12-CV-289-REW |
| v. | ) | |
| | ) | |
| JPMORGAN CHASE BANK, N.A., | ) | |
| | ) | MEMORANDUM OPINION AND |
| Defendant/Counterclaimant, | ) | ORDER |
| | ) | |
| v. | ) | |
| | ) | |
| JAMES L. BATES, | ) | |
| | ) | |
| Counterclaim Defendant. | ) | |

*** *** *** ***

The Court considers the parties' cross-motions for summary judgment. Plaintiff and Counterclaim Defendant, First Technology Capital, Inc. (FTC), filed a (since removed, on diversity) petition for declatory judgment on the underlying contract claim. Defendant and Counterclaimant, JPMorgan Chase Bank, N.A. (Chase), filed contract, fraud, and unjust enrichment counterclaims against FTC and, on the latter counts, individually, against James L. Bates, the President of FTC. Both sides now seek judgment as a matter of law on the claims.

In this hotly disputed commercial case, there actually is little fight over the facts. The parties scarcely contest the sequence or specifics of the communications and dealings between them. Rather, the parties train their considerable fire on the legal effect and actionability of a short relevant history in the early summer of 2012. Through extensive

briefing and oral argument[1] the Court has fully heard and considered the positions of Chase and FTC/Bates[2] on dueling summary judgment motions. The summary judgment standards, on this fully developed record, direct judgment for FTC and Bates[3] and against Chase on all claims. For the reasons that follow, there was no valid contract on June 28. Further, as to the fraud and negligent misrepresentation claims, Chase did not rely reasonably to its detriment on misrepresentations from FTC or its agent, attorney Bunch, and there otherwise was no actionable fraud. Finally, no basis exists for application of the equitable principles of unjust enrichment.

Chase cites many wounds from its dealings with FTC, but, legally at least, those largely are self-inflicted; Chase has no remedy in this case, and FTC and Bates are entitled to judgment as a matter of law.

## I. Relevant Factual and Procedural Background

First Technology Capital, Inc. (FTC), is a Kentucky corporation owned by James L. Bates. DE #7 (Disclosure Statement). FTC, as part of its daily operations, acquires and/or invests in various assets.

In September 2010, FTC executed a Term Promissory Note with Tennessee Commerce Bank for approximately $10.47 million dollars in order to purchase 100% of the beneficial interest in Dougherty Air XVIII Investment Trust. Dougherty Air

[1] The FTC/Bates motion is at DE #99 and the accompanying memorandum and exhibits are at DE #100. Chase responded in opposition at DE #105, and FTC/Bates replied at DE #110. Chase's motion for summary is at DE #101. FTC/Bates responded in opposition at DE #103, and Chase replied at DE #109. The Court held oral argument on the motions on September 5, 2014. DE #143 (Minute Entry).
[2] Treated as one under the reference "FTC" except where a distinction matters.
[3] The Court considers the Bates Affidavit to the extent it communicates personal knowledge. The Court looks directly to the record to the extent Bates purports to summarize other testimony or proof.

administered the subject Trust as owner trustee. The Trust owned (or contemporaneously acquired) a 1999 McDonnell Douglas MD-83 (DC-9-83), tail number N973TW. The Trust leased the MD-83 to American Airlines, Inc. through a long-term lease. FTC acquired a beneficial interest in the Trust and a right to (at least most portions of) future lease payments. As part of the Promissory Note and financing terms, FTC assigned Tennessee Commercial Bank a 100% security interest in FTC's assets, to include its beneficial interest in the Trust and any ensuing proceeds. DE #100-1 (Bates Affidavit) at 2-3, ¶¶ 3-5; DE #101-18 (UCC Financing Statements); s*ee also* DE #34 (First Amended Counterclaim) at 6-7, ¶ 18 (generally discussing documents).

American Airlines suspended lease payments on November 29, 2011, after filing for Chapter 11 bankruptcy reorganization. *See In re AMR Corp., et al.,* No. 11-153463 (SHL) (Bankr. S.D.N.Y.). In January 2012, American Airlines renegotiated the terms of the lease. *See* DE #100-2 (Partial Term Sheet). The term sheet to which the parties agreed awarded the "Lessor" a "separate and distinct stipulated, allowed general unsecured non-priority pre-petition claim" against American Airlines in the amount of $22,886,139. *Id.*[4] The parties do not dispute that, around this same time, the Federal Deposit Insurance Corporation (FDIC) took over Tennessee Commerce Bank and acquired its assets. Thus, as receiver of the bank, the FDIC acquired FTC's loans (including the loan related to the MD-83) and became the lienholder on FTC's assets.

Prompted by the FDIC's entrance on the scene, and in an effort to negotiate terms of a discounted payoff of its indebtedness to the Tennessee Commerce Bank (and the FDIC), FTC engaged Intuitive Processes and Controls (iPAC). *See* DE #101-22 (email

---

[4] The term sheet is also labeled as a "Stipulation and Order Approving Section 1110(b) Extension for N973TW."

chain from FTC to iPAC principals). FTC made an initial Offer of Compromise to the FDIC on April 20, 2012. DE #101-25 (detailing initial offer and providing updated (July 13, 2012) receivables). On June 14, 2012, Bunch corresponded with Hon. Matthew Haddock, an attorney with iPAC, about an FDIC deal. DE #101-26. Haddock advised Bunch: "Now, [iPAC] will do our best in this area, but there are no promises and even estimates are difficult. You may end up having to bid." *Id.*

On June 20, 2012, the bankruptcy court allowed the identified claim. *See* DE #100-3 (Stipulation) at 14 ("The general unsecured non-priority pre-petition claim against American set forth in Section 5.1 of the Term Sheet is hereby allowed."). Within days, FTC began marketing the claim. W. Thomas Bunch, FTC and Bates's long-time attorney, emailed Matthew Pennella at Chase on June 22, 2012:

> We represent First Technology Capital, a company located near Lexington, Kentucky in Versailles, Kentucky. FTC was the owner of a beneficial interest in an aircraft leased to American Airlines. On Wednesday the order (attached hereto) was entered approving the modified lease and granting FTC an allowed unsecured claim of $22,886,139 (this is in Sec. 5.1 on the unredacted copy which can be provided if we proceed). FTC is interested in the sale, assignment and transfer of this claim. The sale must be without recourse. Mr. Bates, the principal of FTC, is looking upward toward $10 million for the sale of this claim. Would you be interested; if so make me your highest and best offer.

*Id.* at 3 (June 22 Email from Bunch to Pennella). Bunch attached the redacted second stipulation to the email, promptly forwarded to John C. Barone, as Pennella was out of the office.

Chase, via Barone, made an initial offer within hours:

> Thank you for all your help today on First Technology Capitals [*sic*]. JPMorgan is very interested in working with you and your client on their allowed American Airlines, Inc. Claim for $22,886,139.00. For your reference, JPMorgan is pleased to provide First Technology Capital with a firm bid of <u>33%</u> on this claim, which will result in net proceeds to your

client of $7,552,425.87. This bid is good until 5pm EST today. If acceptable, please let me know and I will send you an email confirmation. We look forward to Mr. Bates response.

DE #101-30 (email from Barone to Bunch). FTC did not accept the offer, but, through Bunch, expressed FTC's desire to continue negotiations after the weekend. DE #101-31 (email from Bunch to Barone); *see also* DE #101-32 (email exchanges between Bunch and Barone). Barone reached out to Bunch on Monday, June 25, noting volatility in the market and stating: "I would love to try and lock this up, subject to documentation, today if Mr. Bates is interested." DE #101-32 (email from Barone to Bunch). Barone emailed Bunch again on Tuesday, June 26. DE #101-33. The correspondence affirmed Chase's interest in FTC's claim and extended a 32.75% bid. *Id.* Discussions with Chase continued throughout the day on June 27. DE #101-34.

On Thursday, June 28, 2012, Bunch emailed Barone regarding a bid US Bank purportedly made to FTC. Following additional emails between Bunch and Barone and Bunch and Bates, Barone presented Chase's "best and final" offer:

> First, thank you again for giving JPMorgan the opportunity to bid on your claim, this is an important transaction for us. . . . I spoke with our desk and JPMorgan is please[d] [to] provide you with a best and final bid at 35.75% on your $22mm allowed American Airlines, Inc. claim. This bid is good **until 5pm EST today**, June 28, 2012 and is subject to review of your due diligence and execution of a Transfer of Claim agreement. We [*sic*] very interested in working with you on this opportunity and hope this is reflected in our bid. Please confirm via email if we are done and you would like to lock in this price.

DE #101-37 (email from Barone to Bates and Bunch). FTC accepted the offer at 5:19 p.m. on Thursday, June 28. DE #101-38 ("JC: Mr. Bates has authorized me to accept your offer below during our agreed extended time. I will have Mr. Bates confirm this by

separate email. Please advise when we may close. I would like to do the extra and final paperwork tomorrow afternoon: we are both exhausted right now."). Barone responded:

> Thank you for your email. Upon Mr. Bates confirmation email, we will be done at 35.75% subject to the provisions outlined under our initial bid. Please have Mr. Bates send me an email with his confirmation. Thank you again for choosing to work with JPMorgan on this important transaction.

DE #101-39 (email from Barone to Bunch and Bates). That same evening, Bates, Barone, Bunch, and a Chase trader participated in a telephone conference, during which Bates orally confirmed the transaction. *See* DE #101-40 (email from Bunch to Barone discussing telephone conference). Later that night, Bates personally confirmed the email from Bunch. DE #101-2 (Email from Bates to Barone) ("JC, This will confirm the email from Tom. Thanks, JIM.").

Following this flurry of activity, both parties confirmed the sale with their respective companies that evening. DE #101-3 (email from Bates to FTC employees: "Dan and Doug, The AA Claim has been sold at .3575. . . ."); DE #101-41 (email from Barone to Chase employees: "Guys, JPMorgan buys a $22,886,139.00 allowed American Airlines claim at 35.75% from First Technology Capital, Inc. subject to review of due diligence and execution of a Transfer Agreement."). That night, Barone also emailed Howard Grossman, in-house counsel for Chase, and Pennella regarding a lien search. DE #101-46. Chase recorded the purchase on its books on June 29, 2012.[5] *See* DE #102-1 (Sealed Ex. indicating purchase on Chase's High Yield Loan Trading Blotter); DE #102-2 (Sealed Ex. reflecting trade by Alex Bea).

---

[5] Per Barone, the trade was "booked" on June 29 because Bates sent the confirmation email after business hours on June 28. DE #101-44 (Barone Depo.) at 4 (Depo. p. 78).

On the morning of Friday, June 29, 2012, Barone emailed Bunch, introduced Grossman as the individual who would "run[] with the settlement of this transaction," and requested particular information/documents relating to due diligence. DE #101-45 (email from Barone to Bunch, Grossman, and Pennella). Grossman responded, in part:

> In addition to the documents that [Barone] requested, it would be helpful to review the complete term sheet as well as any proofs of claim forms that have been filed. Also, we have ordered a UCC search and will need to understand and resolve any liens that may appear.
>
> Once we review the basic documents, we will forward a draft Transfer of Claim Agreement.

DE #101-47. Bunch responded:

> If you run a UCC search, you will find a February 2012 Article 9 filing for a lien on the assignment of the master lease in favor of Tennessee National [*sic*] Bank. This bank is in receivership with the FDIC but the loan assignment is current and not in default. The lending documents and the other agreements do not include an assignment of rental proceeds so it is our conclusion that the allowed claim sale proceeds go to FTC. We will forward all documents to you for your evaluation and conclusions, but in the meantime we have representatives negotiating with the FDIC for the sale of our paper to FTC, which will ameliorate any future legal problems with your client. Otherwise if necessary we can close the transaction with a trust agreement that all proceeds of the sale be held by a trustee in escrow for all parties pending resolution of the disputes. We believe all problems will be settled before we have any closing.

*Id.* (email from Bunch to Grossman, Barone, and Pennella). As part of the same correspondence, Bunch also requested a "short non-disclosure or confidentiality agreement whereby JPCM [*sic*] agrees not to make the non-redacted copy public and use it only for acquisition of the allowed claim." *Id.*

Chase learned of the lien search results on the morning of June 29, prior to Bunch's email. *See* DE #101-19 (email from Chase employee Margaret Garrity to Barone and Grossman). The search revealed 15 total liens: 11 were terminated and 4 related to

Tennessee Commerce Bank. *Id.* Later that afternoon, Chase emailed Bunch a form Non-Disclosure Agreement (NDA). Per Chase: "Our form was specifically developed for use in the bankruptcy claims market and it's been our experience that it contains provisions that are accepted by market participants and our counterparts." DE #101-51 (email from Rebecca Canada to Bunch). FTC and Chase executed the NDA shortly thereafter. *See* DE #100-17.

By July 3, Bunch purported to have provided Chase with all of the requested documents, and Grossman indicated on July 5 that he would review the documents and forward a claims transfer agreement. DE #101-52. In a separate email of the same date, Grossman requested that Bunch provide the UCC lien releases for the Tennessee Commerce Bank filings. DE #100-18 (email from Grossman to Barone). Bunch responded on July 5:

> [O]nly one of the items 10, 11, and 12 pertain to the aircraft and we are in the process of obtaining a release. The loan with the Tennessee bank is current, not in default and FTC still owns the aircraft. We believe the lien is on the beneficial interest of FTC in the aircraft and not on any proceeds. We will know more by this Friday or Monday.

DE #101-7 (email from Bunch to Grossman).

Chase decided and agreed to sell the FTC AA Claim on July 9. DE #100-20 (email from Pennella to Barone and Bea advising, in part: "We are selling the AA Inc claim we are buying from First Technologies to GoldenTree and MatlinPatterson."). Chase sold $17,886,139 of the claim downstream to GoldenTree and sold the remaining $5,000,000 downstream to MatlinPatterson. *Id.* Chase promptly presented both buyers with draft trade confirmations, which contained a "Binding Agreement and Standstill" clause:

> Upon execution by the parties, this letter shall constitute a binding agreement between the parties and Seller shall cease discussions with other potential purchasers and will decline all other bids with respect to the Claim.

DE #100-21 (email with trade agreement from Chase to GoldenTree); DE #100-22 (Ex. 22) (email with trade agreement from Chase to MatlinPatterson). The parties never signed those documents. DE #100-4 (Grossman Depo.) at 67 (Depo. p. 261).

On July 10, Grossman emailed Bunch to "check on progress in obtaining copies of the final documents and the allowed claim listing in the Debtor's Claims Register." Grossman indicated that receipt of these documents would result in Chase completing a Transfer of Claim Agreement. DE #101-56 (email from Grossman to Bunch). Bunch addressed the status of the documents in a July 11 email to Grossman and other individuals at Chase. DE #101-59 (Bunch email). Bunch also stated the following:

> When this transaction was originally done, Mr. Bates, president and owner of FTC, paid Minnesota lawyers to review the historical documents and assure him as to valid ownership. When FTC liened the aircraft to the Tennessee Commerce Bank, its attorneys verified the historical ownership and transfers of the aircraft. When I hired NYC bankruptcy counsel, they verified the FTC ownership prior to negotiating with the AA bankruptcy lawyers. The AA lawyers requested verification of ownership and were satisfied. The allowed unsecured claim was preserved in the order after notice, no objection, entry and now finality.

> FTC owns the aircraft and the claim and has a right to sell the claim to Chase.

> Mr. Bates and I believe you have done all due diligence in verification of ownership of the claim and you should be ready to do the Transfer of Claim documents. Mr. Bates has instructed me to provide no further information to you and to advise you that we have emailed everything that we have and can supply nothing else. He is upset about the costs of document production when Chase is protected by the finality of the AA order.

> Thus my instructions are to review the final transfer documents, get you the AA Claims Register POC Number (due later this week) and move

toward closing. We all believe that we have more than satisfied what would be yours and our due diligence.

*Id.* Internal Chase correspondence indicates that, as of July 11, it considered FTC to have submitted all requested documents. DE #100-23 (July 11 email from Grossman to Barone and Garrity). Meanwhile, on the same date, FTC learned that it could receive a higher offer for the claim. DE #101-57 (FTC emails regarding claim offer from Brager). Bunch advised Bates: "The 973 claim is sold to Chase under a valid and binding sale contract, even though it is less than the Chase contract. I assume you were fishing for some information to us if we can buy 974 and market it." *Id.*

On July 16, 2014, Chase confirmed that the claim was listed in the Claims Register. *See* DE #101-58 (July 16 email from Garrity to Grossman). That same day, Chase emailed FTC a "proposed Transfer of Claim Agreement" listing "both FTC and Dougherty." DE #101-60 at 5 (July 16 email from Gross to Bunch); *see also* DE #100-25 (draft Transfer of Claim Agreement). Bunch responded on July 20, indicating that Dougherty Air did not agree to the transaction:

 [Y]esterday I learned from the FTC corporate lawyer, Andy Stephens (I am the business bankruptcy lawyer) that Dougherty Air, the trustee-owner of the aircraft, had contacted him concerning the fact that the American Airlines bankruptcy lawyers had included it as a co-owner or co-claimant under the Claims Register and pursuant to the Agreed Order that approved the final term sheet with the allowed unsecured claim. Dougherty is claiming that they have an economic interest in the claim and its assignment, that Chase and FTC were aware of this inter-relationship when we began our negotiations, that we omitted including them in the contracting process, and that they cannot be compelled to join in a contract and the Assignment of Claim Agreement between FTC and Chase.

. . . .

Mr. Bates has indicated to both Andy and me that he is desirous of moving forward with the sale of the claim to Chase and that Andy and you should find a way to make this transaction work by dealing with Dougherty Air

directly. At this point, I cannot obtain Dougherty as a signatory to the Transfer of Claim Agreement but stand by to finalize the transaction after you and Andy resolve the problems with Dougherty.

DE #101-61 at 2 (July 20 email from Bunch to Grossman). Grossman responded, in part, on July 23: "We need to understand Dougherty's position. In any event, we have a binding trade with FTC and want to close this trade promptly." DE #101-62 at 2 (July 23 email from Grossman to Bunch). On July 26, following various phone conversations over a period of days, Grossman emailed Stevens:

I spoke to the Desk. The Desk has no interest in accepting a buy out from Mr. Bates and FTC to break the binding trade. If FTC and Dougherty do not proceed to closing, we will be forced to pursue our rights and remedies.

*Id.* (July 26 email from Grossman to Stevens).

Grossman followed up with Bunch via email on July 31 to "check[] on your comments to the Assignment of Claim document." DE #101-11 at 4 (July 31 email from Grossman to Bunch). FTC had not yet responded by August 1, when Grossman asked to speak to FTC "before this trade spirals out of control." *Id.* at 3. Later that night, Bunch responded, indicating FTC's prior expectation that the trade "would work predicated upon the guarantee from IPAC that the FDIC would accept [FTC's] Offer of Compromise the following week." *Id.* at 2. Bunch's email contained the following statement:

Howard's suggestion of buying time to see if the FDIC OC is accepted was predicated on having the Transfer of Claim Agreement executed and then he can advise the downstream buyer that there is a glitch in the closing but all parties are working to make the glitch go away. If the glitch goes away then there can be a closing [between Chase and its downstream buyers]. My problem as a lawyer is that the TCA contains representations and warranties of no encumbrances and we all know that there is a recorded encumbrance on the claim in excess of the amount due FTC from

Chase. This issue could be something that Howard and I could work around.

*Id.* at 2.

On August 10, 2012, Stephens sent a letter to Grossman offering to sell to Chase at 40.75 percent. DE #101-63 (August 10 email letter from Stephens to Grossman). Chase denied that FTC's "settlement proposal" made any sense, DE #101-64, and indicated that Chase would other pursue its "rights and remedies all of which are hereby reserved." *Id.*

FTC filed its petition for a declaration of rights the same day in Woodford Circuit Court. *See* DE #1-1 (Petition) at 3. Chase timely removed on September 11, 2012. DE #1 (Notice of Removal). Chase, perceiving an obligation to its downstream buyers, entered into "negotiated resolutions" with both GoldenTree and MatlinPatterson wherein Chase paid each the difference between the market price and the buyer's trade price with Chase. *See* DE #100-30 (MattlinPatterson Netting Letter); DE #100-31 (GoldenTree Netting Letter); *see also* DE #101-65 (Money Account Transfers). FTC and Dougherty Air ultimately sold the Claim to Citigroup Financial in March 2013 for a significantly higher figure. *See* DE #101-66 (Assignment of Claim Agreement).

After a lengthy and contested period of discovery, both sides moved for summary judgment. Following oral argument and extensive briefing, the motions are ripe for review.

## II. Standard of Review[6]

Pursuant to Federal Rule of Civil Procedure 56, a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 at 414 ("The party moving for summary

---

[6] A court applies the same standard of review to cross-motions for summary judgment as when only one party to the litigation files. *McKim v. New Market Techs., Inc.*, 370 Fed. App'x 600, 603 (6th Cir. 2010). A court must evaluate each motion on its own merits, drawing all reasonable inferences against the party whose motion is under consideration. *Beal ex rel. Putnam v. Walgreen Co.*, 408 Fed. App'x 898, 902 (6th Cir. 2010). Summary judgment is not necessarily appropriate simply because the parties file cross-motions for summary judgment. *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 593 (6th Cir. 2001) (footnote omitted). Indeed, "'the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'" *Id.* (quoting 10A Wright, Miller & Kane, *Federal Practice & Procedure* § 2720 (3d ed. 1998)).

judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.* at 106 S. Ct. at 2552. If the movant bears the burden of persuasion at trial, "that party must support its motion with credible evidence—using any of the materials specified in Rule 56(c)—that would entitle it to a directed verdict if not controverted at trial." *Id.* at 2556 (citation omitted) (Brennan, J., dissenting); *see also Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002) (noting that, when the movant also bears the burden of persuasion at trial, the moving party's initial summary judgment burden is "higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it") (citation and internal quotation marks omitted).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find

for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp. v. FDIC*, 187 Fed. App'x 428, 444-45 (6th Cir. 2006).

## III. Analysis

A. *The June 28 exchanges did not result in a valid contract under the "all or nothing" approach of Kentucky law.*

The email exchanges of and prior to June 28, and including FTC's oral bid acceptance, did not create a binding contract under Kentucky law.[7] The negotiations began a few days earlier, when Bunch reached out to Chase (and others) with a tout for the sale of FTC's allowed Claim, premised on its beneficial interest in the plane leased by the Trust to AA. DE #100-3 (June 22 Email from Bunch to Pennella). That initiating email characterized FTC as owning a "beneficial interest" in the underlying aircraft and attached a redacted portion of the relevant negotiated resolution and claim approval order. After several days of negotiating, Chase (by agent JC Barone) sent the bid undergirding Chase's contract claim. The $8+ million deal hinges on only a few words in two sentences. Chase made a "best and final bid at 35.75% on your $22mm allowed" AA claim. Per Chase's language, "This bid . . . is subject to review of your due diligence and execution of a Transfer of Claim agreement." DE #100-6 (June 28 email from Barone to Bunch). FTC accepted the bid. DE #100-7 (June 28 confirmatory emails). Chase confirmed the deal, on Bates's own confirmation (which occurred, *see id.*), again "subject

---

[7] Both sides rely only on Kentucky contract cases; the Court thus, without choice of law analysis, treats the matter as governed by the substantive law of the Commonwealth in this diversity case. *Erie Railroad. Co. v. Tompkins*, 58 S. Ct. 817, 822 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state."); *see also Legg v. Chopra*, 286 F.3d 286, 289 (6th Cir. 2002) ("In federal diversity actions, state law governs substantive issues[.]").

to the provisions outlined under our initial bid." DE #100-7 at 3 (June 28 email from Barone to Bunch). The parties did not discuss on the 28th what it meant for the bid to be "subject to" the provisions Barone included.

The Court has carefully assessed the following cases: *Giverny Gardens, Ltd. P'ship v. Columbia Hous. Partners Ltd. P'ship*, 147 Fed. App'x 443 (6th Cir. 2005) (unpublished); *Estate of Riddle ex rel. Riddle v. S. Farm Bureau Life Ins. Co.*, 421 F.3d 400 (6th Cir. 2005); *Mercury Dev., LLC v. Motel Sleepers, LLC*, No. 11-147-GFVT, 2013 WL 500337 (E.D. Ky. Feb. 11, 2013); *CAF & Assocs., LLC v. Portage, Inc.*, 913 F. Supp. 2d 333 (W.D. Ky. 2012); *MidAmerican Distr., Inc. v. Clarification Tech., Inc.*, 807 F. Supp. 2d 646 (E.D. Ky. 2011); *Associated Warehousing, Inc. v. Banterra Corp.*, No. 5:08-CV-52-TBR, 2010 WL 2745981 (W.D. Ky. July 9, 2010); *Richey v. Perry Arnold, Inc.*, 391 S.W.3d 705 (Ky. 2012); *Stevens v. Stevens*, 798 S.W.2d 136 (Ky. 1990); *Simpson v. JOC Coal, Inc.*, 677 S.W.2d 305 (Ky. 1984); *Brooks v. Smith*, 269 S.W.2d 259 (Ky. 1954); *Cinelli v. Ward*, 997 S.W.2d 474 (Ky. Ct. App. 1998); *Walker v. Keith*, 382 S.W.2d 198 (Ky. Ct. App. 1964); *Johnson v. Lowery*, 270 S.W.2d 943 (Ky. Ct. App. 1954).

Under Kentucky law, a valid contract must include the parties' obligations in sufficiently "definite and certain terms." *Kovacs v. Freeman*, 957 S.W.2d 251, 254 (Ky. 1997). The content, oral or written, must detail adequately the material or "essential" terms on which the parties purportedly have agreed. By and as part of the agreement, the parties must themselves sufficiently point to the standards for measuring the fulfillment and boundaries of each material item. As it relates to the key issue of open material terms

and prospective negotiation, Kentucky takes an all or nothing approach to contracting.[8]

Thus, while the modern contracting trend would enforce a preliminary agreement that essentially binds the parties to good faith negotiations on open terms, Kentucky treats a preliminary agreement—even one evincing intent to be bound—as unenforceable if material terms remain subject to future or further negotiation. *See Cinelli*, 997 S.W.2d at 478 ("Either the agreement is enforceable as a binding contract to consummate the transaction or it is unenforceable as something less."); *see also Giverny*, 147 Fed. App'x at 446 (contrasting modern trend and Kentucky rule).

The dividing line between a concrete deal and an unenforceable preliminary agreement is adequate material term definition. A court certainly can, in the appropriate case, consider the parties' conduct and the extrinsic circumstances of bargaining. If the parties supply an adequate source or reference for supplying meaning to an otherwise open material term, a court can treat the agreement as sufficiently conclusive. However, if a material term is open and without a discernable reference point, the parties have not agreed, and a court cannot bind either side to the immature deal. If negotiations remain as to material terms and if there is no agreed key by which to fill an otherwise open essential provision, no contract exists. Terms are material that define agreement particulars and performance parameters. *CAF & Assocs.*, 913 F. Supp. 2d at 343 ("Material terms are those terms essential to the enforcement of a contract.") (citing *Warren v. Cary-Glendon Coal Co.*, 230 S.W.2d 638, 640 (Ky. 1950) ("[I]t is essential that the contract itself be specific and the certainty required must extend to all particulars essential to the enforcement of the contract, such as the subject matter and purpose of the contract, the

---

[8] This may be different in some aspects under the Kentucky UCC, but no party contends that this case involves the sale of a good.

parties, the consideration, the time and place of performance, terms of payment and duration of the contract.")).

     *Cinelli* (which itself discussed and built on *Walker*, *Stevens*, *Simpson*, and *Lowery*) is the authoritative treatment. The Sixth Circuit said so in *Giverny*. District Courts have followed suit, *see CAF & Assocs.*, 913 F. Supp. 2d at 343, as will this one. The parties here agree that construction of the documented exchanges, and a determination of whether a contract arose, is a matter of law for the Court.

     Chase contends that the bid itself—"35.75% on your 22mm allowed American Airlines, Inc. claim"—covers all contract essentials. "This offer contained all the material terms of the agreement to buy the Claim: the identity of the Claim, the price, and the amount to be purchased. . . . There were only administrative actions that needed to be completed." DE #101-1 (Chase SJ Memorandum) at 14. It is telling to the Court that Chase, as master of its offer, relegates the critical areas of contention in this case and in its bid to mere "administrative actions." After all, it was Chase that inserted and repeated to FTC (and internally, *see* DE #101-41) that its bid was "subject to" two particular conditions, its due diligence review and the parties' execution of a formal "Transfer of Claim" agreement.[9] Chase used but a handful of words in only two sentences to define its bid of $8+ million; it would be nonsensical to treat any of those words as not reflecting an issue material and essential to the offering and accepting parties. Indeed, Chase, by its included words, expressed that it would be bound only if the transaction survived its due diligence and if the parties entered a "Transfer of Claim agreement."

---

[9] The Court notes but will not dwell on the absence of any agreement on when the transfer was to occur. Time for performance normally would be a material term—neither side here makes anything of the absence.

The Court finds, on the legal question of whether the email exchanges created a contract, no valid and binding agreement. Applying plain meaning, the phrase "subject to" could have various roughly harmonious synonyms. Thus, Chase's bid may have been "governed by" the stated conditions, including the later formal agreement; Chase's bid may have been "conditioned on" fulfillment of the provisions. Thus, Webster's Unabridged defines the adjective "subject" followed usually by "to," as "being under control, "being under dominion," "being dependent or conditional upon." *Webster's Unabridged* 1893 (Deluxe ed. 2001).

Either way, the bid was not a stand-alone commitment. It locked in Chase's obligation to pay the stated price for the stated asset, but only insofar as the deal passed muster, as a matter of due diligence, and only if the parties signed an undefined Transfer of Claim agreement.[10]

FTC contends that the requirement of an executed Transfer of Claim agreement renders the deal unenforceable for lack of material term definition.[11] The Court agrees. Chase made the requirement a predicate of its bid. At the time of the negotiations, there obviously was no extant Transfer of Claim agreement. Further, (and giving Chase the

---

[10] FTC does not focus on the due diligence aspect. Nothing in the bid defined the dimension of Chase's escape hatch. Could Chase avoid the deal if it encountered anything of subjective concern? Was there an objective limitation on the effect of Chase's review? The parties did not say, and the bid is not clear. This sharply contrasts with Chase's treatment of the topic in the documentation for the July 9 downstream sales. In those dissimilarly papered deals, Chase made the transactions "subject to" a series of precise terms, including "each Buyer's satisfactory review and diligence, in its reasonable discretion, of the Supporting Documents." *See, e.g.,* DE #100-21 at 5. Thus, when selling, Chase attempted to tether its buyer's review right to an objective standard; when buying, however, Chase left its review right naked.

[11] FTC misreads or over-reads the meaning of ¶ 8 of the Confidentiality Agreement. That clause only characterizes the effect of the Confidentiality Agreement itself. The language does not impact whether or not a binding deal existed prior to that point.

greatest possible latitude in terms of inferences in the record) the parties did not discuss, with any precision or detail, what that agreement would involve or entail. If the bid hinged on execution of an undefined and non-existent agreement, then obviously, the parties would have to negotiate and reach that agreement at some point **after** the bid date. This is precisely the type of agreement-to-agree that Kentucky refuses to enforce under the *Cinelli* line.

The Court first notes that, while Chase calls TCA execution merely an administrative step, Chase would not close the transaction without that document and the warranties it contained. It viewed the TCA's terms as significant and required the formal document. *See* DE #100-4 (Grossman Depo.) at 37 (Depo. pp. 139-40) (discussing importance of terms to Chase); *id.* at 6 (Depo. p. 17) (discussing requirement of agreement; DE #100-5 (Grossman 30(b)(6) Depo.) at 26 (Depo. p. 94) ("I think Chase considers all of the provisions in the agreement important.").

Chase did not prepare and send the first draft of the TCA until July 16, over 2 weeks after the final bid. There was good reason for that delay, and the cause demonstrates the open nature of the TCA itself. Chase envisioned that the TCA would result from its due diligence review. Thus, Chase would draft the TCA in response to and following its document analysis. *See* DE #100-10 (Barone email outlining due diligence process and listing, as final step, preparation and presentation of TCA for FTC's "review and comment"); DE #100-13 (Grossman email, following list of documents needed, noting he would "forward a draft" TCA after he had seen the relevant documents). That is just what happened and highlights the fluidity of the TCA as a collection of terms governing the deal. In other words, Chase needed to know more about the transactional

specifics in order to complete the collection of terms it deemed important and required, terms not known at the time of or expressed in the bid exchange.

Chase determined, as part of its due diligence, that owner/trustee Dougherty Air had to be part of the deal. Whether that is accurate depends perhaps on an understanding of the parties' relative rights and the underlying legal documents (a collection that would include the governing trust and likely the precipitating AA lease). Whether that is accurate also depends on the nature of what FTC was attempting to sell and whether FTC could alienate its interest in the AA Claim without Trustee involvement. Chase ultimately concluded that it would require Dougherty Air to sign off as Owner Trustee and drafted the TCA accordingly. Indeed, per the draft TCA, Chase included Dougherty Air as a signatory, included warranties from Dougherty Air, and would have required Dougherty Air alone to sign the formal transfer document to be filed with the Bankruptcy Court. None of that was encompassed or stated in the June 28 exchange. Dougherty Air was not included in or a part of any of the emails. Plainly, if the TCA added a distinct party, based on Chase's analysis of the papers and legal landscape, the TCA could not have been concluded and agreed to as of the bid date. The parties would have had to agree later, which is fatal to finding a contract on the date in question. The treatment of Dougherty Air shows the materiality of the TCA as a bundle of terms and signatories designed to define the parties' ultimate rights, duties, and performance. The TCA, devoid of content on June 28, was material to the deal.[12]

---

[12] The Court does not view *Hughes v. Demoisey*, Nos. 2010-CA-2093-MR, 2010-CA-2165-MR, 2010-CA-2166-MR, 2014 WL 2632504 (Ky. Ct. App. June 13, 2014), as calling for any different analysis. That case, though enforcing an oral settlement agreement, expressly requires "full and complete terms" for contract validity. *Id.* at *5; *id.* at *6 (requiring that "material terms" be agreed on for enforcement of oral settlement).

Chase sent the draft TCA on July 16. That pithy and term-laden document, DE #100-25 (draft Transfer of Claim Agreement), does much more than simply effect the exchange contemplated by the bid—that Chase would pay 35.75% for FTC's AA claim. In fact, the TCA, in a detailed series of clauses applicable to three entities, defines the parties' precise undertakings, contains a series of warranties, contains a series of past and prospective representations, and contains significant releases. Further, the TCA purports to, among other things, fix venue and jurisdiction for any dispute and waives (evidently only as to the sellers) any jury trial right. *See id*. Needless to say, Chase did not reference any of these terms in the June 28 bid.

The Court again contrasts this scenario with the downstream sales. Barone himself spoke for Chase in both scenarios. In dealing with FTC, Barone simply and succinctly declared the bid "subject to . . . execution of a Transfer of Claim agreement." DE #100-6 (June 28 email) at 2. In dealing with the downstream buyers no later than two weeks later, Barone created a detailed, multi-page term letter, characterizing the transactions as "subject to" multiple terms, including the doubly "subject to: (iii) Execution by Seller and each Individual Buyer of a Transfer of Claim Agreement . . . substantially in the form attached hereto." DE #100-21 at 4-5. Thus, Barone supplied (or knew how to supply) a TCA template to the downstream buyers, as a basis for agreement, but supplied no template when dealing with FTC on June 28.

As in *Walker*, the Court is seeking to define "what the agreement actually was." *Walker*, 382 S.W.2d at 202. Thus, Chase conditioned the bid offer on execution of a

---

The question here, and a distinction from that case, is one of application and definition of term materiality.

TCA. The parties agreed to that extent, but what, then, was to be the content of the TCA? Either the parties must supply the term(s) itself or the parties must provide the Court an adequate reference to the intended content. *See id.* at 203 (requiring agreement on term or on "definite method of ascertaining it"). Kentucky law certainly allows the Court to define a necessary term if the parties agree sufficiently as to the defining source. In *Simpson*, for example, the parties required negotiations between a buyer and shareholder toward a "similar arrangement" reached with prior parties. The extant prior agreement provided a source for measuring the performance of the later parties. *See Simpson*, 677 S.W.2d at 309. In *Walker*, however, a reference to future "comparative business conditions" was too indefinite to provide a valid measure.

Chase has, at bottom, two curative theories. First, it argues that the lack of significant objection by FTC to the July 16 draft shows basic agreement to TCA content. Second, it argues that FTC demonstrated clear intent to be bound and that Bunch knew what a TCA would include. Though each theory is well-argued, neither suffices under Kentucky law.

Per Chase, FTC really only objected to the title warranty included in the TCA. That clause, DE #100-25 (draft Transfer of Claim Agreement), did draw a particular objection from FTC. Because of the status of the FDIC lien at the time, Bunch communicated in late-July that he could not allow FTC to sign the TCA because the warranty would not have been true. This does not mean that FTC affirmatively agreed to all other TCA terms, but that would not matter anyway, in this context. Chase cannot, in the Court's view, argue that the progress of post-June 28 negotiations on TCA content proves an agreement on TCA content **as of** June 28. The clever argument misses the

chronology of contracting under the Kentucky rule. Even if the parties might likely agree to future terms, even if the parties **almost** agree to future terms, the fact that terms remain for future negotiation and agreement at the alleged contract date renders an agreement-to-agree unenforceable in Kentucky. The TCA was a basket empty of terms when Chase made its execution a bid condition.

The closest call on the record is whether FTC's demonstrable perception of the bid effect impacts the *Cinelli* analysis. Like Chase, FTC described the matter as a done deal when FTC accepted on June 28. *See* DE #101-3.[13] In an attorney-client communication FTC disclosed in discovery, Bunch chastened Bates for assessing a possible competing bid on July 11, calling the AA Claim "sold to Chase under a valid and binding sale contract." DE #101-4 at 2. The fact that FTC's chief negotiator took this position gives the Court significant pause in the context of summary judgment, and the Court has wrestled exhaustively with this unusual factor. Ultimately, the question of whether a contract formed is a legal one, and the Court focuses not on Bunch's legal view but rather on whether Bunch's role and vantage point mean that he, for FTC, agreed to all material terms on June 28.

There is no evidence that Barone and Bunch had any discussion of TCA term specifics. Barone claims he said the documentation for the transfer would include a so-called "market standard" transfer agreement. DE #100-8 (Barone 30(b)(6) Depo.) at 10 (Depo. pp. 32-33). He admits, however, that he recalls no discussion of what specifically the grant would include. *Id.* Bunch contradicted Barone on the "market standard" reference, DE #105-2 (Bunch Depo.) at 27 (Depo. p. 103), but the Court credits Barone's

---

[13] Even internally, though, Barone described the buy as "subject to review of due diligence and execution of a Transfer Agreement." DE #101-41.

version for analysis purposes and assumes he made the allusion. Bunch further testified to being experienced in the claims market: "I know what a transfer of claim agreement is. We bankruptcy lawyers execute those regularly." *Id.* at 22 (Depo. p. 83).

While Barone may have used shorthand as to the TCA, and Bunch may have known conceptually what a transfer of claim agreement "is," the Court could not possibly find sufficient mutual factual definition regarding the content of such an agreement on June 28. Indeed, the record and Chase's own dealings show there is no "standard" for agreements of this type. Barbara Scholl, Chase's expert, contrasted the distressed loan and trade claim market. While the former has "standardized terms," the latter does not:

> The LSTA has not to date issued standard documents for the settlement of trade claims. Instead, each broker/dealer uses its own form of documentation for trade confirmation and settlement which may differ from that of other firms.

DE #105-1 (Scholl Report) at 5. Attorney Grossman confirmed that Chase uses its own form, which is subject to negotiation between parties. DE #100-4 (Grossman Depo.) at 20 (Depo. p. 70) ("It's our form document, and sometimes there are details to be filled in."). He confirmed no prior discussion with FTC regarding TCA content, *id.* at 44 (Depo. p. 166), and he anticipated comments from FTC on the draft sent. *Id.* at 47 (Depo. pp. 177-78). Finally, and again, the fact that Chase referenced a draft TCA with its downstream buyers (and that those buyers continued to negotiate over TCA language) shows that the notion of a market standard agreement has little meaning, even to Chase.

Chase's expert Scholl further indicates the materiality and dynamic nature of the TCA process. She parallels distressed loan and trade claim deals, breaking the typical deal into steps, with an initial "binding" trade followed by due diligence and a later formal transfer of claim or assignment agreement. She describes the due diligence, in the

loan-sale context, as occurring "prior to entering into a commitment to buy." DE #105-1 (Scholl Report) at 7. Though she still describes the parties as bound initially, she characterizes the formal documentation process as one by which the parties "generally exchange and negotiate settlement documents," and this includes the "opportunity for the parties to obtain representations and warranties" regarding "authority to enter," "clear title," and non-impairment of the claim. *Id.* at 11. Chase here calls the formal documentation following its 2 line bid as only "administrative actions," but Scholl says of the formal papers, "[t]hese writings serve risk management, auditing, financial reporting, and legal purposes." *Id.* at 6. If Chase thought inclusion of a required TCA was important enough to include it in the bid, then it also was important enough to be essential to the binding nature of the transaction. To the Court, the bid means Chase will pay the price, but if and only if the deal passes inspection and the parties agree on a TCA. Obviously, the bid then cannot stand alone from language essential to defining its validity and operative effect.

Bunch's words cause FTC the most problems, something of a fixture in this litigation. Still, the Court could not determine that by Bunch generically testifying he "knows" what a TCA is, he agreed to Chase's particular and institution-specific terms on June 28. Again, that TCA did not exist in draft form until July 16. It could not have existed until Grossman received and reviewed the due diligence materials and reflected his review in the draft. Further, it is one thing to know categorically what a document "is" (such as a promissory note, subordination agreement, security agreement), but each of those recognized generic legal documents is a vessel into which parties pour contracted terms as to a non-generic transaction. Simply knowing generally what a document

classification signifies is not the same as knowing in advance all material terms of a prospective agreement, particularly one in the specific context of an allowed bankruptcy claim as to a leased airplane owned in trust.

Finally, as to FTC's perception of being bound, *Cinelli* undoubtedly teaches that **feeling** bound is not tantamount to **being** bound. In that case, the parties' agreement (by comparison, a multi-page, single-space, term heavy formal document) stated that it was a "valid and binding agreement." *Cinelli*, 997 S.W.2d at 479-82 (Appendix ¶ 8). Despite that declaration, the Kentucky Court found the agreement insufficiently definite because, in part, the document required entry into various agreements (employment and shareholders agreements) not yet drafted. Further, one side retained a due diligence right unfettered by any standard other than that party's "sole discretion." *Id.* at 482. This undercut the treatment of the formal document as actually and intended to be fully binding. The parallels here are unmistakable. Bunch's viewpoint as a legal conclusion on July 11 thus does not alter the Court's conclusion that the bid exchange did not bind the parties on the key June 28 date. A document may have the form of a contract "without having the intended legal effect." *Brooks*, 269 S.W.2d at 260. For neither the first nor the last time in the case, Bunch was mistaken on the law.

The Court finally must acknowledge and bow to the treatment of this area in *Giverny*. Contrasting the "modern trend" in case law that would enforce a preliminary obligation and binding duty to negotiate toward resolving open terms in good faith, *Giverny* recognized and applied *Cinelli* as requiring Kentucky's all or nothing approach. Both *Giverny* and *Cinelli* involved a preliminary transaction between sophisticated entities acting at arms-length. Both featured detailed, lengthy agreements that nominally

bound the parties. Both involved prospective open terms including, as a direct parallel here in one case, the call for shareholder agreements with "typical restrictions." *Cinelli*, 997 S.W.2d at 479-80 (Appendix ¶ 4). Both included a due diligence out, which the courts concluded undercut the intended binding nature of the transactions. Both refused to enforce.

Simply put, Kentucky does not impose a duty of good faith negotiation to conclude a deal not already binding at the time of alleged contract formation. If the fully-lawyered and documented agreements in *Giverny* and *Cinelli* fell to the agreement-to-agree axe, then the two sentence effort by Chase, which is comparatively much thinner and infinitely less determinate, surely also falls.[14]

Chase made its bid subject to entry of an agreement yet to be negotiated. The bid thus hinged on the parties' future assent to a then unknowable bouquet of terms. Chase viewed the TCA as a deal requisite and all of its provisions as important—the bid was conditioned on execution of an agreement that did not exist, in draft, until mid-July. In a valid contract, parties must "specify all material and essential terms and leave nothing to be agreed upon by future negotiations." *Lowery*, 270 S.W.2d at 946 (citation omitted).

---

[14] Chase alludes to a duty of good faith in concluding the deal and also cites *Riddle*. *Giverny* plainly rejects, under Kentucky law, an enforceable duty to negotiate toward agreement of open material terms. *Giverny*, 147 Fed. App'x at 450 (rejecting temptation to "modernize" Kentucky rule and impose a duty toward good faith negotiation). *Riddle* involved the effect of post-insurance underwriting under a conditional receipt. Kentucky treats a conditional receipt as a valid contract and imposes a good faith duty on assessment of insurability. *See Riddle*, 421 F.3d at 406. The case involves evaluation of a term legally cloaked by a good faith duty in a binding contract, not determination of whether parties adequately agreed to form a contract in the first place. FTC had no implied duty of good faith as to a contract that itself was not binding. *Giverny*, 147 Fed. App'x at 450 ("Since this letter of intent is unenforceable under Kentucky law, [Plaintiff] cannot assert a breach of the implied duty.").

By definition, the material TCA was a prospective undertaking, which forecloses contract existence on June 28, the bid date.  FTC is entitled to judgment on all contract claims.

> **B.** *Chase cannot demonstrate by clear and convincing evidence reasonable reliance on any misrepresentations by FTC, and FTC did not otherwise commit actionable fraud.[15]*

As plaintiff on all misrepresentation theories, Chase has the burden of establishing each claim element. It must prove all fraud elements by clear and convincing evidence. While Bunch certainly made statements that were false and, in a vacuum, misleading, the

---

[15] *Because of the resolution of the motion, Chase's tardy supplementation is harmless.*
The Court considers the merits of Chase's fully evolved misrepresentation and fraud allegations. This is so despite what clearly was late supplementation under Rule 26(e). That Rule requires a timely corrective supplementation if a prior disclosure or response "is in some material respect . . . incomplete or incorrect" and has not otherwise been corrected. Here, Chase detailed its fraud assertions in the pleadings (including the First Amended Counterclaim from September 2013) and in discovery (including the original Interrogatory No. 13 Answer from June 2013 and Grossman's Deposition from January 2014). Chase's position, as it then existed, hinged on representations or omissions in advance of the June 28 bid acceptance. Discovery closed on March 19, 2014. Then, the day before the summary judgment deadline (May 15, 2014), Chase sent a supplemental answer to Interrogatory No. 13. The supplemental answer added multiple particular allegations as to both fraudulent misrepresentations and omissions. The supplemental answer also expanded the period to post-June 2012 conduct. Chase attempts to justify the delay by referencing the March deposition dates as the time it learned fully of the Dougherty Air history. That element is a narrow sliver of the alleged fraud. Further, even if Chase's argument is correct (and Chase certainly had knowledge of and the ability to explore Dougherty Air's involvement from the time of the deal) Chase does not explain why it waited from March to mid-May to supplement.
Both sides had access to the underlying factual events for a lengthy period. In that sense, then, the supplementation did not surprise FTC. However, access to a factual story and understanding what allegedly constitutes fraud are distinct notions. Chase had multiple chances to detail its claim, and a significant claim enlargement after the discovery close and on the day prior to dispositive motion briefing is improper. If the final claim description were to survive summary judgment, the Court would view the tardy supplementation as harmful and thus injecting impermissible information on a motion under the self-executing sanction of Rule 37(c)(1). However, the Court has considered the merits and finds for FTC on the misrepresentation claims. Thus, the supplementation works no harm.

context, history, and particular chronology would preclude any reasonable factfinder from determining that Chase reasonably relied, to its detriment, on any misrepresentations by Bunch.

Chase—simply applying its self-styled mantle—sits at the apex of the trade claims market. It is a "market maker," DE #105 (Chase SJ Response) at 6, is a "prominent broker," and deals regularly with the highest volume traders in the subject matter. DE #105-1 (Scholl Report) at 15 (calling Chase a "leading distressed debt broker/dealer" and one of 75 major players). In the draft TCA supplied by Chase as its standard form, which Chase intended to govern the formal underlying transaction with FTC, Chase described itself as "a sophisticated investor with respect to the purchase of the Claim," one with "knowledge and experience, [that] has made investments of a similar nature, so as to be aware of the risks and uncertainties inherent in the purchase" of such rights. DE #100-25 (draft Transfer of Claim Agreement) at ¶ 5.

Further, Chase predicated its deal with FTC on an unrestricted right to due diligence review. As previously discussed, Barone made the bid "subject to review of your due diligence." DE #100-6 (June 28 email from Barone to Bunch) at 2. Though this verbiage is somewhat awkward, Chase clearly premised the bid on satisfactory (if standardless) due diligence review. Within hours of bid acceptance, Chase had sent FTC a list of required materials and prospective steps. *See* DE #100-14 (June 28-29 emails) at 3-4. Barone required "all non redacted legal documents associated with the claim" and "all underlying documentation related to the claim . . . [including] any other documents which support the claim." *Id.* (June 29 email from Barone to Bunch). Chase communicated from the first morning that it would conduct a lien search "to ensure the

claims have no liens against them." *Id.* Any lien would require a lien release, or as Grossman put it on that morning, "[W]e have ordered a UCC search and will need to understand and resolve any liens that may appear." *Id.* at 3 (June 29 email from Grossman to Bunch). Chase unquestionably would never have closed the deal without clear title. *See* DE #100-4 (Grossman Depo.) at 18 (Depo. p. 64). The due diligence out assured Chase it would not be bound to a deal to which it had foundational (or perhaps any) objections.

Chase complains about a series of representations and omissions over the course of the relationship. In the view of the Court, the key demarcation point is July 9, when Chase claims it sold the AA Claim to the downstream buyers. It is these sales, on this record, that signify provable damage, if any, to Chase from its dealings with FTC. *See* DE #109 (Chase SJ Reply) at 27 ("Chase justifiably relied on . . . misrepresentations and . . . omissions . . . in attempting to sell portions of the Claim to other investors on July 9, 2012."). [Although Chase attempts to characterize its segregation of purchase funds as, in and of itself, damage, nothing in the record indicates that the act of booking the trade harmed Chase. Indeed, Chase points to no particular opportunity lost from the action. Isolation of purchase funds theoretically could or could not result in damage, based on transactions pursued or forgone and the results of same. No evidence describes Chase hitting a capital ceiling that resulted in the FTC deal, as booked, costing Chase other profitable transactions. As FTC establishes, there is no evidence in the record indicating that the bid accounting itself harmed Chase.].

Regarding alleged misrepresentations and improper omissions, the Court has carefully parsed the record, using Chase's discovery answers, pleadings, and particulars

listed in the briefing. Chase primarily complains about **omissions** relative to conduct before June 29. Thus, in offering to sell the AA Claim, FTC did not, per Chase, disclose "that there was a lien," that the FDIC was involved, and that the FDIC would have to consent in advance of any actual transfer. *See* Interrogatory 13 Answer (original version). Chase built on this later by adding as omissions, that "the loan underlying the lien was in default and the amount of the underlying loan was greater than the proceeds." *See* Interrogatory 13 Answer (supplemental version). Further, Chase complains that FTC did not disclose that "Dougherty Air would have to consent" and that Dougherty Air effectively was absent from the table. At the time of deposition in January 2014, Chase made clear that its primary contention of fraud prior to the bid acceptance involved an act of nondisclosure: "They did not tell Chase that the lien—that the claim was encumbered." DE #100-5 (Grossman Depo.) at 9 (Depo. p. 28).

Chase tries to treat FTC's bid solicitation as, itself, an actionable representation. Effectively, Chase contends that when FTC offered to sell the AA Claim, it impliedly represented clear title to make the deal. That construct would require the Court to treat what Chase calls an *implicit* representation of title as an actionable affirmative statement; in effect, this would impose an implied title warranty on any contract right offer. Chase cites no law to support the notion that an offer to sell a claim of this nature includes an implied title warranty under Kentucky law. Certainly, the parties could contractually include that in the deal (and Chase tried hard to do just that in the TCA's terms), but treating any sale offer as automatically including a title warranty could convert any transaction blocked by a title problem into  supporting both an implied contract and valid fraud claim. Warranty is generally a matter of contract, and Kentucky law does not

support the fraud/contract blend Chase proposes. The Court wonders why Chase would so vociferously require the extensive warranties if the offer alone contained a clear title representation. *See* DE #105-1 (Scholl Report) at 11 (calling formal document "opportunity for the parties to obtain representations and warranties that the seller has . . . clear title to the claim").

A variant of this concept appears in the Kentucky cases treating certain promises as actionable in fraud. Thus, a promise made with no intention to honor that promise can, situationally, support a fraud assertion. If party A promises to sell something with no intention to make the sale, (assuming other elements), a fraud claim might obtain. *See Terrell v. Tecsec, Inc.*, No. 06-CV-310, 2007 WL 2670047, at *6 (E.D. Ky. Sept. 7, 2007) ("Promises to act in the future are actionable [in fraud] if, at the time the promisor made the promise, he had no intention of actually performing."). Whatever the ultimate causes of the deal failure here, the record points only to the conclusion that FTC entered the market intent on selling the AA Claim and taking out the FDIC debt. Bates and FTC thought the FDIC would be amenable to a "haircut," hired a firm to present and pursue an Offer of Compromise, and by all accounts in the record expected to take the FDIC out via sale of the AA Claim. *See* DE #51-3 (Bates Depo.) at 22 (Depo. pp. 80-81) (describing Chase bid price as "sufficient cash to satisfy the current offer and compromise at the FDIC" and expectation: "I simply wanted to settle with the FDIC and be through with them"); DE #101-21 (discussion of "haircuts at the FDIC").

Though the "guarantee" from Haddock is of dubious reliability (and the Court does not premise any decision on crediting that guarantee), Haddock certainly was working to resolve FTC's FDIC issues, and the AA Claim was to be the source of funds.

*See also e.g.,* DE #105-1 (Scholl Report) at 8 ("In mid-June 2012, FTC made an Offer in Compromise . . . to the FDIC to satisfy the outstanding loans in exchange for a multimillion dollar payment. Mr. Bates planned to fund the OC settlement with proceeds from the sale of the Claim."). When it offered the Claim, the only possible factual finding is that FTC did intend to make a sale. Thus, this is not a situation where FTC made a promise with sham-like intentions as to promise fulfillment.[16]

The only cognizable affirmative representations Chase complains about happened **after** bid acceptance. The list turns almost completely on emails sent by Bunch to Grossman on June 29, July 5, and July 11. Again, relying on Chase's enumeration, FTC affirmatively misrepresented its ownership of the Claim, its ability to convey the Claim, the nature of the loan documents, loan status, lien scope and whether FTC was "in the process of obtaining a release." Interrogatory 13 Answer (supplemental version). The Court has assessed all of the relevant and cited communications prior to July 9.

Chase alleges three fraud or misrepresentation theories: fraud by misrepresentation, fraud by omission, and negligent misrepresentation. While each has its own distinct elements, all include a common reliance component. Chase must show its "actual reliance on the communication with good reason." *Thomas v. Schneider*, No. 2009-CA-2132-MR, 2010 WL 3447662 (Ky. Ct. App. Sept. 3, 2010) (citing *Wilson v. Henry*, 340 S.W.2d 449 (Ky. 1960) and *Ann Taylor, Inc. v. Heritage Ins. Services, Inc.*,

---

[16] There is no genuine dispute in the record, premised on the deposition of Bates and his affidavit, that FTC's plan was to resolve the FDIC debt through a negotiated compromise that would have involved funding the compromise payment through sale of the Claim. The lien clouded the Claim, but the lien satisfaction would have removed the cloud. *See* DE #103-1 (Bates Response Aff.) at ¶¶ 10, 15-16, 30, 71; DE #51-3 (Bates Depo.) at 23 (Depo. pp. 82-84). This is an unsurprising chain of dominos, when dealing with the sale of an encumbered asset, that the parties could have effected in one properly sequenced closing if the predicate OC negotiations had succeeded.

259 S.W.3d 494 (Ky. Ct. App. 2008)). Whether a party has relied justifiably or unjustifiably on another's fraudulent misrepresentation often presents a fact question. *Id.* (citing *W. Leasing, Inc. v. Acordia of Kentucky, Inc.*, No. 2008-CA-2237-MR , at 11 (Ky. Ct. App. May 7, 2010) (unpublished)). However, summary judgment may be appropriate if "it appears absolutely clear from the record that the party did not or could not rely justifiably on the communication." *Thomas*, 2010 WL 3447662, at *4 (citing *Ann Taylor*, 259 S.W.3d at 501). Reliance is not justified if a party knows of the representation's falsity or if its falsity is obvious to the party. *Id.* (citing *Restatement (Second) of Torts* § 541). If Chase "'had access to information that was equally available to both parties and would have led to discovery of the true facts, [Chase] had no right to reply upon the misrepresentation.'" *Lamb v. Branch Banking & Trust Co.*, No. 2008-CA-1984-MR, 2009 WL 4876796 (Ky. Ct. App. Dec. 18, 2009) (citing *Honolulu Disposal Serv., Inc. v. Am. Benefits Plan Adm'rs, Inc.*, 433 F. Supp. 2d 1181, 1193-94 (D. Haw. 2006)).[17]

---

[17] In *Lamb*, the court observed:

> [I]ndeed, the founding premise of Appellants' complaint, which we are bound to take as the truth, is that a title examination did reveal, or would have revealed, the defects at issue in this litigation. As the records necessary for any title examination would have been a matter of public record to which Appellants had equal access, Appellants were properly charged with constructive notice of these defects upon purchasing their properties before the Appellee banks had any involvement. In light of this notice and their equal access to this information, it is clearly unreasonable for Appellants to wholly fail to allege any reasonable excuse for their own collective failure to examine their respective titles or the deed of restrictions when they purchased their respective properties without the involvement of any of the Appellee banks, and instead claim that they relied upon an alleged misrepresentation (*i.e.,* that there were no defects in the title of the properties) made by the Appellee banks several months afterward.

*Lamb*, 2009 WL 4876796, at *3 (internal footnote omitted).

Indeed, reliance is not reasonable "when either 'minimal investigation would have revealed the truth, or when [the relying party] closes its eyes and passively accepts the contradictions that exist in the information available to it.'" *Claypool v. Brock*, No. 2010-CA-1268-MR, 2011 WL 3793419, at *3 (Ky. Ct. App. Aug. 26, 2011) (quoting 37 *Am. Jur., Fraud and Deceit* § 239 (2011)).

Fraud by omission turns on a party's duty to disclose. *Giddings & Lewis, Inc. v. Indust. Risk Insurers*, 348 S.W.3d 729, 747-49 (Ky. 2011). The claim has "substantially different elements" from fraud by misrepresentation. *Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636, 641 (Ky. Ct. App. 2003). To prevail on its claim of fraud by omission for FTC's alleged failure to disclose a material fact, Chase must clearly prove (1) that FTC had a duty to disclose the fact; (2) that FTC failed to disclose that fact; (3) that FTC's failure to disclose the material fact induced Chase to act; and (4) that Chase suffered actual damages. *Id.* The question of a party's duty to disclose is a matter of law. *Id.* (citing *Smith v. Gen. Motors Corp.*, 979 S.W.2d 127, 129 (Ky. Ct. App. 1998) and *Restatement (Second) of Torts* § 551 cmt. m (1977)).

Kentucky recognizes a duty to disclose in four instances. *Id.* Chase concedes that the first two circumstances (a duty arising from a confidential or fiduciary relationship or a duty imposed by statute) are inapplicable to the instant transaction. However, Chase alleges that the third and fourth situations apply. Indeed, a duty may arise "'when a [party] has partially disclosed material facts to [an opposing party] but created the impression of full disclosure,'" *id.* (quoting *Rivermont*, 113 S.W.3d at 641), or "'where one party has superior knowledge and is relied upon to disclose same.'" *Id.* at 748 (quoting *Smith*, 979 S.W.2d at 129).

In *Smith*, a car dealership did not disclose to the buyer the fact of "pre-sale" repairs to the new vehicle purchased by Smith. *Smith*, 979 S.W.2d at 128. The court there found, as a matter of law, that the dealership's "superior knowledge and Smith's reliance thereupon" imposed a duty upon the dealer "to disclose **material defects** and **repairs** known to it." *Id.* at 129. As a secondary matter, the court also found that statutory provisions prompted a duty to disclose the car's pre-sale history. *Id.* at 129-30.

In *Rivermont*, the court declined to find that the disclosing party had only partially disclosed but given the impression of full disclosure and thus found no duty. The relying party, Rivermont Inn, Inc., had signed documents acknowledging that the disclosing party, Holiday Hospitality Franchising, Inc., did not make oral representations or enter into oral agreements. *Rivermont*, 113 S.W.3d at 641-42. As such, the court found that Rivermont could not claim that such an oral representation would lead it to believe that it would receive a franchise but on terms otherwise not expressed. *Id.* The court also did not find a duty in *Giddings & Lewis*, where a salesperson's observation equated to a "concern," not a material fact. *Giddings & Lewis*, 348 S.W.3d at 748. In that case, the court deemed the comment at issue "plainly not an experienced fact, just an observation borne of consideration of basic principles of engineering, principles known to the engineers on both sides of the transaction." *Id.*

In contrast, Kentucky has found a duty to disclose when there is a partially disclosed material fact. In *Bryant v. Troutman*, 287 S.W.2d 918, 920-21 (Ky. 1956), the Supreme Court of Kentucky reversed a grant of summary judgment, finding that when a seller failed to disclose latent defects in real property, and the buyer was unaware of the defects and thus induced to purchase the home, the buyer could maintain an action for

fraud. In *Highland Motor Transfer Co. v. Heyburn Bldg. Co.*, 35 S.W.2d 521 (Ky. 1931), the court found a duty when a seller did not disclose a latent defect and knew that the buyer acted upon the assumption that no defect exists. Specifically, the seller did not disclose the existence of a buried swimming pool filled with earth and debris that required excavation. *Id.* Finally, in *Dennis v. Thomson*, 43 S.W.2d 18 (Ky. 1931), the court found that a corporate prospectus failed to accurately portray the status of the company and thus a duty arose to fully disclose the company's status. *Id.* at 23 ("To present the corporation by the prospectus without fairly disclosing the facts as to its equipment, the amount invested in improvements and plants, and as to its being engaged only in making laboratory tests, was a fraud upon prospective purchasers by suppression of the facts.").

In order to prevail on its claim of fraud by misrepresentation, Chase must prove six elements: (1) FTC "made a material representation"; (2) "which was false"; (3) "which was known to be false or made recklessly;" (4) "which was made with inducement to be acted upon"; (5) which Chase "acted in reliance upon"; and (6) which caused Chase injury. *Rivermont,* 113 S.W.3d at 640. Chase bears the burden by clear and convincing evidence. *Farmers Bank & Trust Co. of Georgetown, Kentucky v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky. 2005); *see also Yeager v. McLellan*, 177 S.W.3d 807, 809 (Ky. 2005); *Pezzarossi v. Nutt*, 392 S.W.3d 417, 419 (Ky. Ct. App. 2012). "Where the facts or circumstances of a case only allow for inferences, conjecture, or suspicion, such as would 'leave reasonably prudent minds in doubt,' there is a failure of proof to establish fraud." *Marrowbone Pharmacy, Inc. v. Johnson*, No. 2010-CA-429-

MR, 2011 WL 6004345, at *5 (Ky. Ct. App. Dec. 2, 2011) (quoting *Goerter v. Shapiro,* 72 S.W.2d 444, 446 (Ky. 1934)).

However, for either fraud by misrepresentation or fraud by omission, Chase may develop its claim:

> [B]y the character of the testimony, the coherency of the entire case as well as the documents, circumstances and facts presented. *See Trs. of the First Christian Church v. Macht,* 15 S.W.2d 509, 510 (Ky.1929). Fraud may be established by evidence which is wholly circumstantial. *See Grant v. Wrona,* 662 S.W.2d 227, 229 (Ky. Ct. App. 1983); *Johnson v. Cormney*, 596 S.W.2d 23, 27 (Ky. Ct. App. 1979).

*United Parcel Servs. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999).

As to the final element of fraud by misrepresentation, Chase need not prove the amount of damages with certainty; it only must establish with certainty the existence of damages. *Rickert*, 996 S.W.2d at 469. A "jury may determine the fair and reasonable estimate of the particular injury." *Id.* (citing *H.C. Hanson v. Am. Nat'l Bank & Trust Co., Ky.,* 865 S.W.2d 302 (1993)).

## 1. The Court rejects application of fraud by omission.

The Court finds, as a matter of law, that the relationship and interaction between FTC and Chase created no disclosure duty, and Chase's fraud by omission theory thus fails. Kentucky sharply limits the contours of the duty to disclose, which here would apply only where a partial disclosure creates the impression of full disclosure or where one party, with superior knowledge, is relied on to disclose that superior knowledge. Neither scenario applies in this commercial event.

By premising its bid on unfettered due diligence review, Chase expressly determined that it would rely only on its own satisfactory review, not the analysis or representations of FTC, in determining whether to buy the AA Claim. Chase pursued the

right by demanding that FTC provide for review all manner of Claim-related materials. Acting for its own protection, Chase immediately procured a lien search. Further, the morning after bid acceptance, FTC did communicate its views on certain matters concerning the FDIC lien. Many of Bunch's positions were inaccurate, but he described his analysis as "our conclusion" and agreed to "forward all documents to you for your evaluation and conclusions[.]" DE #101-5 (June 29 email from Bunch to Grossman).

Further, the TCA draft shows that Chase intended to rely only on the TCA's written warranties and Chase's own analysis and due diligence—its "own independent investigation" as a "sophisticated investor." DE #100-25 (draft Transfer of Claim Agreement) at ¶ 5. **Thus, Chase's intended contractual approach expressly was not to rely on FTC's characterization (or lack of characterization) of any aspect of the deal, outside of the TCA itself, but rather to verify and rely on its independent and adequate analysis.**

Chase received the redacted bankruptcy court approval order on June 22, with the first bid solicitation, and the unredacted order on July 3. The documents identified all of the "Aircraft Parties." DE #110-2. The documents characterized the FTC/Dougherty Air relationship and cited to a lengthy roster of underlying "Existing Operative Documents." Chase asked (and had the right to ask) for all papers as part of its due diligence review. It received the bulk of the requested AA Claim documents (by no later than July 6).  DE #100-19 (July 6 email from Bunch to Grossman purporting to attach documents); DE #100-4 (Grossman Depo.) at 32 (Depo. pp. 121-22). Chase, per Grossman, did demand and receive the underlying Trust document. *Id.* at 17 (Depo. p. 59); *id.* at 33 (Depo. p. 122).

Indeed, by virtue of the due diligence condition and the Confidentiality Agreement executed between Chase and FTC, Chase had access to "nonpublic, confidential, or proprietary" information in connection with the Claims. DE #100-17 (Confidentiality Agreement) at ¶¶ 1-2. Chase had such access expressly with the power to share same with its "representatives"—lawyers, employees, counsel—having the "need to know" the information "for purposes of evaluating the Transaction." *Id.* at ¶ 3. There was no information pertinent to the deal that Chase could not rightfully have demanded in order to feel assured and comfortable with the transaction; again, the retained due diligence exercise had no limit or modifier.

Given the negotiated right to access and Chase's clear retention of a due diligence bid condition, the Court finds as a matter of law that FTC had no duty of disclosure with respect to the transaction that would support a fraud by omission claim. Whether or not Chase had its eyes wide open on June 28, Chase certainly assured that it could see and know all it needed before honoring the bid. The *Giddings* disclosure duty simply does not apply. The due diligence and access right guaranteed Chase would (or could) place itself on an equal footing in terms of transactional knowledge. Chase obviously was not depending on FTC's narration of the deal and would make its own assessment of whether ultimately to close. The limited situations of disclosure duty under Kentucky law do not encompass this commercial scenario. *See Long John Silver's Inc. v. Nickleson*, 923 F. Supp. 2d 1004, 1021-22 (W.D. Ky. 2013) (rejecting application of disclosure duty in non-fiduciary commercial contracting scenario where one party, by contract, expressly "had the opportunity to perform its own due diligence" and could have uncovered the allegedly omitted facts).

## 2. *Chase did not reasonably rely on any misrepresentation to its detriment.*

For Chase's misrepresentation theories to advance, its reliance on any representation must have been reasonable and detrimental. No reasonable factfinder here could conclude that Chase reasonably and detrimentally relied on any misrepresentation by FTC.[18]

First, as author of its bid, Chase should have known that as of June 28 bid acceptance, it had no binding deal with FTC. Chase inserted the requirement of a future formal agreement that prevented a contract from arising, under Kentucky law, on June 28. This should have caused Chase to advance with caution. Whatever Chase thought as of July 9, FTC was not bound to sell the AA Claim (and had no enforceable right to buy the Claim) on that date because of the negotiation machinations between the parties. [Incidentally, there is utterly no suggestion in the record that Chase, which knew it was buying from a Kentucky-based Owner Participant, considered that Kentucky contract law might have a distinct, non-modern say in the parties' relative rights.].

Second, Chase's reserved due diligence right, unfettered by any standards, meant Chase both would complete an independent due diligence process and that Chase could balk at any problem it discovered. As discussed previously, Chase fully asserted this opportunity by requesting "all underlying documentation related to the claim," a request that extended to the Tennessee Commerce Bank agreements, the Existing Operative Documents, and "any other documents which support the claim." DE #100-14 (June 29 email from Barone to Bunch). Chase sent a Confidentiality Agreement that assured FTC could disclose nonpublic information. Chase received and analyzed, or certainly had the

---

[18] For the same explained reasons, the Court also rejects Chase's negligent misrepresentation theory, which includes the same reliance component.

right to receive and analyze, all documents pertinent to the AA Claim, FTC's rights, and the foundation undergirding the bid.

Third, Chase immediately knew that a lienholder existed and that the FDIC was in play. Even before Bunch's June 29 morning email, Chase's due diligence apparatus had run a UCC lien search on FTC and knew the recorded scope of the Tennessee bank's (thus FDIC's) lien. Bunch identified the FDIC receivership, so Chase knew FDIC stood in the Tennessee bank's shoes. [Notably, even the redacted term sheet, shared back on June 22, arguably identified Tennessee Commerce Bank as an interested lender under FTC's notice provision, separately identifying the lender's counsel. DE #100-3 (including order and redacted term sheet) at 17. The service list included the Bank and counsel under the FTC column.]

Fourth, Chase also knew from the start that Dougherty Air was a factor. Even pre-bid, Chase got the redacted term sheet. That document identified Dougherty Air as the Owner Trustee of the plane and FTC as the Owner Participant. *See id.* Further, even a cursory review of the attachments to the solicitation shows that Dougherty Air was an independent signatory and party to the stipulation before the bankruptcy court. The document included a service list that identified Dougherty Air's contact information and counsel, all separate from that of FTC.

Grossman knew enough to have Chase search the AMR claim register for Dougherty on **June 29**. DE #103-2 (June 29 email from Grossman to Garrity). By July 3, Chase had received the full, unredacted Term Sheet. That sheet referenced the Claim amount payable to Lessor and identified Dougherty Air as that Lessor. DE #110-2 (Second Stipulation) at ¶¶ 1.1, 5.1. The unredacted Term Sheet expressly discussed

transferability of the Prepetition Damages Claim, characterizing the Claim as "transferable . . . by the Lessor or any of its transferees[.]" *Id.* at ¶ 5.2 Chase also knew from the time of FTC's initial inquiry that FTC touted only a "beneficial interest" in the Claim. DE #100-3 (June 22 email from Bunch to Pennella). By July 6, Chase had received the bulk of documentation pertaining to the Claim. Chase, to that point, had not heard from or been in contact with Dougherty Air. The Court sees no indication that FTC ever purported to speak for the Trustee, obviously a separate entity, and Chase would or should have known under the documents that Dougherty Air's voice mattered.

The Court further observes the unique place and role of Bunch in this transaction. He was the lead negotiator for FTC and the point person for Chase's dealings. His communications were, to be frank (and charitable), of dubious soundness. Indeed, looking across the deal landscape, Bunch communicated with a blend of questionable legal analysis, plain lack of factual insight into the underlying paper, and an inconsistent ability to advance the transaction. Some of this may have been an issue of competence with respect to a deal of this complexity. Some may have been delay or interference as FTC tried to work things out with the FDIC. Ultimately, Bunch's narration and communications immediately and consistently generated unmistakable red flags that should have raised the suspicions of even the most trusting deal companion. The sophisticated Chase, an apex market participant, should quickly have seen that Bunch was, at a minimum, in over his head and was not to be counted on to relay reliable information. *See* DE #100-4 (Grossman Depo.) at 6 (Depo. p. 15) (estimating "in the thousands" as the number of trade claims Grossman has handled).

Consider the June 29 email. Remember, Chase already had run a full UCC search and knew FTC's interest was wholly impressed with a lien in favor of Tennessee Commerce Bank. Bunch disclosed the lien but characterized the financing as not including "assignment of rental proceeds." DE #101-5 (June 29 email from Bunch to Grossman). Bunch's conclusion was that "proceeds go to FTC." *Id.* This, Chase knew, was obviously wrong and in direct conflict with the public UCC filings. Chase realized the full coverage of the lien. Bunch repeated this faulty analysis in multiple ways in his short July 5 email. There, he misread the applicable lien entries Grossman highlighted and again asserted his belief ("we believe") that the lien did not extend to proceeds. DE #101-7 (July 5 email from Bunch to Grossman). Grossman again knew—because the two lawyers were talking about the very same lien listing—that Bunch was dead wrong about the applicable entries. He also knew that Bunch continued in the clearly baseless view that the liens did not shade Claim proceeds. Chase cannot know the world is round and yet claim to trust a member of the flat-earth society for reliable cartography.

Bunch made some startling observations and suggestions within the June 29 email that should have caused Chase to take information from him with a sizable salt grain. He acknowledged that the FDIC was standing in place of the Tennessee bank. He claimed loan currency, but then said:

> [W]e have representatives negotiating with the FDIC for the sale of our paper to FTC, which will ameliorate any future legal problems with your client. Otherwise if necessary we can close the transaction with a trust agreement . . . pending resolution of any disputes. We believe all problems will be settled before we have any closing.

DE #101-5 (June 29 email from Bunch to Grossman). These sentences have remarkable aspects. First, Bunch signals that there are negotiations then occurring between FTC and

the FDIC "for the sale of our paper." This inscrutable description at least means there is a matter contested and in need of resolution between FTC and the entity in place of the lienholder, the FDIC. Thus, while Chase may not have known at that time that the accepted bid was lower than the lien amount, Chase knew FTC was reporting a pending and unresolved negotiation between it and the lienholder. The necessity of negotiation creates the clear potentiality that the lien amount would be a problem relative to the sale amount. The unorthodox closing suggestion should have inflamed Chase's suspicion. Bunch was saying there might be enough of a problem to prevent a traditional closing— necessitating some type of trust and escrow of proceeds "pending resolution of any disputes." *Id.* A clear implication from this email, again sent just hours after the June 28 bid acceptance, was that the FDIC role—premised on the lien—was a complicating factor. Even Chase, in briefing, characterized the email as Bunch "disclosing for the first time . . . that there was a risk that First Technology could not convey the Claim without approval from the FDIC." DE #101-1 (Chase SJ Memo) at 16. Chase heard, twelve hours after bid acceptance, that its seller was negotiating with the lienholder and closing mechanics may need to account for and be altered by present "problems." Chase should have been on high alert.

Chase also knew the bankruptcy chronology and had all of the loan documents in advance of the July 9 downstream deals. DE #100-19 (Bunch July 6 transmittal). Thus, Chase knew or had access to the original loan (and thus lien) amount from September 2010. Chase knew the AA bankruptcy commenced in November 2011. Chase knew the bankruptcy and approved Claim reflected some period of interruption in AA payments under the relevant lease. Surely a lender of Chase's experience, having been told that

FTC was negotiating with the FDIC and might have to close with a "trust" to account for "resolution of any disputes" would be wary and sure to confirm the solidity of the potential Chase-FTC transaction before jumping onto the hook as a downstream seller. Chase may not have had the underlying trust document in hand at the time, but Chase was in charge of its own due diligence and should have delayed binding itself until it knew FTC could deliver.

The record reflects no such caution by Chase. Instead, Chase purported to sell the Claim in pieces on July 9 and points to the downstream deals as detrimental reliance. DE #101-1 (Chase SJ Memo) at 20. However, the Court determines that no reasonable factfinder could, given the points already discussed, treat Chase as having reasonably relied on FTC's representations in deciding to make the downstream sales. As such, that fraud and misrepresentation element demonstrably is absent, foreclosing the claim.[19]

The closest questions involve the reported loan status and FTC's statements regarding lien release. There are fact questions, in the Court's view, over the default

---

[19] The Court has significant doubt about whether Chase was bound to honor the downstream deals. Grossman testified that the downstream sellers expressly required a formal written document. DE #100-4 (Grossman Depo.) at 61 (Depo. pp. 235-36). The circulated drafts declared the parties would not be bound until execution of the term sheets, an event that did not occur. *Id.* at 67 (Depo. p. 261); DE #100-21 ("Upon execution by the parties, this letter shall constitute a binding agreement between the parties[.]"). It seems Chase traded ahead of its rights and then determined it had to honor the downstream deals to protect its reputational concerns. *See* DE #105-1 (Scholl Report) at 15 (predicting "severe damage to its reputation" if Chase balked at downstream deals); *id.* at 14 ("Chase's attempts to buy other AMR claims to satisfy Downstream Trades reflects its commitment to fulfilling its obligations under the oral agreement with the buyers consistent with market customs and practices. Failing to find replacement allowed AMR claims to satisfy the Downstream Trades, Chase negotiated settlements with the buyers which the parties effected through netting letters at the prevailing price (that of an auction of a large claim for which a broker/dealer other than Chase submitted the winning bid)."). The Court does not rule on this basis, since Chase cannot prove that it reasonably relied on misrepresentations of FTC in making the decision to sell downstream.

status of the FDIC loan. The Bates Affidavit (claiming loan currency on personal knowledge, *see* DE #100-1 at ¶ 40) conflicts with the FDIC's default letter (DE #101-6). The Court views that letter as potentially admissible as a business or public record under Federal Rule of Evidence 803. Traffic about payment dates between Bunch and Bates (*see, e.g.,* DE #101-68), and the order approval date, which would impact catch-up payments to FTC, would contribute to a question over loan currency. Again, though, the dispositive issue is one of reasonable reliance. Chase had the promissory note and security agreement, knew the bankruptcy chronology, knew the identity of the lender and FDIC entrance, and had an unfettered due diligence right. Bunch told Chase that FTC was negotiating with the FDIC over its paper and the lien. Whether the loan was current or in default could have cut either direction on making an FDIC resolution more probable, but Chase was in position to diagnose the precise status and protect itself, especially before before taking the downstream plunge, irrespective of anything Bunch said.

Finally, Bunch predicted release of the lien. Fraud must involve a misstatement of fact, and Kentucky would not permit Chase to pin its claim on Bunch's predictive failure. *See McHargue v. Fayette Coal & Feed Co.*, 283 S.W.2d 170, 172 (Ky. 1955) ("A mere statement of opinion or prediction may not be the basis of an action."). To the extent Chase complains that Bunch forecast a lien release, the claim fails on this basis. That Bunch said FTC was in the "process" of obtaining a release simply is not untrue, on this record. The entire plan was to use the AA Claim to take out the FDIC's lien. FTC, which proved to be overconfident and likely naïve in its FDIC endeavor, had presented an OC to the FDIC and intended to fund the offer by proceeds from the AA Claim sale. The

sequencing and FDIC solution failed, but the process in motion would, if successful, have satisfied the FDIC and its lien. Negotiating with the FDIC toward the debt (and thus lien) resolution indeed was a process, if not the process Chase assumed. In any event, again, Chase was on its own in the deal and could have determined the precise status through self-protective inquiries.

A sophisticated deal participant cannot suspend its acumen, experience, and common sense when processing a transaction. Kentucky charges market participants, "particularly experienced participants," with the duty to "exercise common sense." *Flegles, Inc. v. TruServ Corp.,* 289 S.W.3d 544, 549 (Ky. 2009). Reliance on factual, not predictive, representations must be reasonable and justifiable. Chase brought consummate wisdom and expertise to this transaction. It encountered or could easily have accessed information, through its due diligence activity, that would have told it the deal was in some peril because of the lien status. While FTC was no model of transparency or accuracy in this transaction, and Bunch could fairly be considered a dissembler, Chase had the right, opportunity, and wherewithal to avoid any exposure or harm. It hardly looked before it leapt, and any resulting harm is not reasonably attributable to the representations of Bunch and FTC.[20]

Chase shows remarkable disregard for its own protective measures. It retained a due diligence right and conditioned any deal on execution of a prophylactic TCA and yet claims a right to reliance on its suspect deal partner. In the downstream context, Chase

---

[20] Based on the Court's analysis, there simply are no affirmative misrepresentations or actionable omissions by Bates individually. At most, Chase links Bates to the offer and acceptance, but the Court has rejected those communications as fitting within a fraud or misrepresentation theory. With no further direct dealings between Chase and Bates, the claims against Bates individually fail.

prepared a document (in a deal requiring a writing) that declared there would be no binding contract without document execution; still, Chase decided to honor the downstream trades. Remarkably, in light of the chronology, the draft TCA between Chase and FTC gave Chase the right "[u]pon the effectiveness of [the TCA]," to "**thereafter** . . . sell . . . any portion of the Claim[.]" DE #100-25 (draft Transfer Claim Agreement) ¶ 9 (emphasis added). Instead of staying within the protection of its due diligence walls, a step that would have assured, per Scholl, Chase was getting "the benefit of its bargain" and could safely deal downstream, Chase instead unreasonably, in this scenario, traded ahead of its known rights. Had Chase simply let the matter conclude in accordance with its retained contracting mechanics, it would have suffered no harm by virtue of the July 9 decision to sell.

    *C. The unjust enrichment remedy is not applicable against FTC/Bates in this context.*

       The Court rejects application of the equitable doctrine of unjust enrichment. The doctrine provides distinct restitution relief "where damages are based directly upon the benefit conferred and retained." *JP White, LLC v. Poe Cos., LLC*, Nos. 2010-CA-267-MR, 2010-CA-299-MR, 2011 WL 1706751, at *5 (Ky. Ct. App. May 6, 2011). A party may seek unjust enrichment upon an implied-in-fact contract. *Flinn v. R.M.D. Corp.*, No. 3:11-CV-386-H, 2012 WL 694037, at *3 (W.D. Ky. 2012) Indeed, "'[t]he claim for unjust enrichment is a legal fiction created to permit recovery where equity says there should be recovery, although there is no recovery in contract.'" *Id.* (quoting *Holley v. Performance Prods., Inc. v. Keystone Auto. Operations, Inc.*, No. 1:09-CV-53-TBR, 2009 WL 3613735, at *5 (W.D. Ky. Oct. 29, 2009)). Whether the doctrine applies is a question of law. *Javier Steel Corp. v. Cen. Bridge Co., LLC*, 353 S.W.3d 356, 359 (Ky. Ct. App.

2011). To prevail on its claim of unjust enrichment, Chase must prove (1) a "benefit conferred upon [FTC] at [Chase's] expense; (2) "a resulting appreciation of benefit by [FTC]"; and (3) "inequitable retention of benefit without payment for its value." *Geurin v. Fulkerson*, 354 S.W.3d 161, 165 (Ky. Ct. App. 2011) (quoting *Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky. Ct. App. 2009)) (internal quotation marks omitted). A party seeking restitution under this doctrine must provide more than "sparse bits of information—rooted largely in conjecture." *Id.* at 166.

Here, the Counterclaim describes the theory as centered on FTC's inequitable retention of the AA Claim (and later sale of the Claim for much more money than the Chase bid would have generated). Chase states that FTC profited "at Chase's expense, because the Claim was rightfully Chase's under the terms of the contract, and because First Technology and James Bates used fraud to retain control of the Claim." DE #34 ¶ 57. The Court has rejected the predicates for the Claim by its prior analysis, finding neither an enforceable right of Chase nor fraudulent activity by FTC or Bates.

Chase elaborated on the theory as the case developed, ultimately settling on the notion that Chase's bid gave FTC a "put option," that the bid gave FTC a price floor; this let FTC re-enter the market with confidence it could seek a better deal, having the price floor to fall back on as an assured minimum. *See* DE #101-1 (Chase SJ Memorandum) at 38-39.

The contract analysis shows, though, that there actually was no enforceable floor. Chase was no more bound than FTC, for all of the reasons stated in the contract section of this opinion. Further, there is no evidence that FTC profited by use of the bid as Chase complains. While FTC did sell the claim for a higher price many months later, the key

period to the Court is that between June 28 and August 10, when FTC went to state court asking for a declaration that no contract existed. FTC did not sell or enter an agreement to sell during that period by using Chase and its bid as leverage. A fact finder could not reasonably find to the contrary, and the legal conclusions regarding the parties' status simply forecloses application of the equitable remedy Chase seeks. That the potential deal failed and FTC later sold to a different buyer does not equate to unjust enrichment.

A "person is not unjustly enriched unless 'the retention of the benefit would be unjust.'" *Guarantee Elec. Co. v. Big Rivers Elec. Co.,* 669 F. Supp. 1371, 1380 (W.D. Ky. 1987) (quoting *Bryan Brothers Packing Co. v. Garrard,* 386 S.W.2d 469, 474 (Ky. 1964)). Chase had no enforceable right in the Claim, during the period in question, because of conditions Chase itself placed on its bid. FTC did not defraud Chase. As such, and under the chronology in the record, FTC's later trade of the AA Claim did not result in unjust enrichment of FTC.

## IV. Conclusion

For the reasons stated, as to all claims, the Court **GRANTS** FTC's motion for summary judgment (DE #99) and **DENIES** Chase's motion for summary judgment (DE #101). The Court will enter a separate Judgment.

This the 9th day of October, 2014.

Signed By:

*Robert E. Wier* $\mathcal{R}\mathcal{E}\mathcal{W}$

United States Magistrate Judge